NOTICE

Decision filed 10/24/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 230048-U

NOS. 5-23-0048, 5-23-0049 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* R.R. and T.R., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Coles County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 20-JA-34, 20-JA-35 |
| | ) | |
| Regina R., | ) | Honorable |
| | ) | Jonathan T. Braden, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE BOIE delivered the judgment of the court.
Justice Barberis concurred in the judgment.
Justice Cates specially concurred.

**ORDER**

¶ 1     *Held*:   We affirm the judgment of the circuit court where the circuit court's denial of a continuance of the best interests hearing was not an abuse of discretion and affirm the circuit court's judgment terminating the respondent's parental rights where the circuit court's findings that the respondent was unfit, and termination of her parental rights was in the best interest of the minors, were not against the manifest weight of the evidence.

1

¶ 2    On August 23, 2022, the State filed a petition to terminate the parental rights of the respondent, Regina R.,[1] as to her minor children, R.R. and T.R.[2] In November 2022, the circuit court found the respondent to be an unfit person as defined in the Adoption Act (see 750 ILCS 50/1(D)(m)(i), (ii) (West 2022)), and that termination of Regina's parental rights would be in the minors' best interests. The circuit court entered an order terminating Regina's parental rights as to R.R. and T.R. on January 25, 2023.

¶ 3    Regina appeals, arguing that the trial court's fitness and best interests determinations were against the manifest weight of the evidence. For the following reasons, we affirm the judgment of the circuit court of Coles County.

¶ 4                                    I. BACKGROUND

¶ 5    Regina is the mother of R.R., born February 2, 2019, and T.R., born December 5, 2019. The minors were placed in shelter care on September 25, 2020, after a fight erupted in Regina's home, when she was a 15-year-old minor herself.

¶ 6    The State filed petitions for adjudication of wardship of the minors on September 25, 2020. The petitions alleged that the minors were not receiving the proper or necessary support in violation of section 2-3(1)(a) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(a) (West 2022)), because Regina had participated in domestic violence within the home and because

---

[1]The juvenile petition was filed against the minors' biological father; however, the parental rights of the biological father are not at issue in this appeal. As such, this court has limited the summarization of the background information to that information related to the respondent and necessary to the issues raised on appeal.

[2]A juvenile petition was filed on behalf of R.R. in matter 2020-JA-34 and on behalf of T.R. in matter 2020-JA-35. The common law records do not contain a circuit court order consolidating the cases; however, the records indicate that the circuit court proceeded with the two separate cases as a single matter. As the matters have proceeded as a single case, the cases are consolidated by order of this court for purposes of this decision. Further, the majority of the orders entered in this case applied to both cases without separate findings concerning each minor. Therefore, we will refer to the filings on behalf of the minors collectively without separately indicating to which minor child the filing applied unless the filings differ, or such clarification is needed for our analysis.

drugs, namely heroin, were being used in the home. The petitions alleged that the minors were in an injurious environment for the same reasons, in violation of section 2-3(1)(b) of the Act (*id.* § 2-3(1)(b)).

¶ 7    The circuit court appointed a special advocate (the CASA) for the minors on September 25, 2020, and the CASA was also appointed as guardian *ad litem*. The circuit court held a shelter care hearing the same day. Kelly Rieck, a child protection specialist with the Illinois Department of Children and Family Services (DCFS), testified at the temporary custody hearing. Rieck testified that DCFS took protective custody of the minors on September 23, 2020.

¶ 8    The family had prior DCFS history that included Emma H., Regina's mother, receiving an indicated report from Iowa for neglect in 2012, where all four of Emma H.'s children, including Regina, tested positive for cocaine. Regina and her siblings were placed in foster care. There were also four prior indicated reports for neglect against Emma H. in Illinois, from 2018 through 2020. In November 2018, when Regina was 13 years old, Emma H. allowed Regina's boyfriend to live in the home and engage in a sexual relationship, causing Regina to become pregnant. In August 2019, Emma H. again allowed Regina's boyfriend to live in the home and have a sexual relationship, resulting in Regina's second pregnancy. In April 2020, Emma H. was indicated by DCFS for domestic violence occurring in the home between siblings. In May 2020, a drug investigation targeting an adult male in the home led to the discovery of fentanyl-laced heroin located on the family's couch in the living room while Regina, her siblings, and her own children were present. Emma H. again tested positive for cocaine on May 13, 2020. Despite the four DCFS investigations over a two-year period leading to indicated reports where Regina was a subject of neglect, DCFS chose not to remove Regina from her mother's home. Instead, Regina was indicated for environmental neglect of her own infants, R.R. and T.R., when she was 15 years old, because

3

the home "did not meet minimal standards," and was indicated along with Emma H. for the presence of heroin in the home.

¶ 9     After the May 2020 investigation, an intact family case was initiated, where services were offered to the family. Rieck testified that the intact case was not successful, as Emma H. chose not to participate. Further, the family could not be located for three of the months that the intact case was in place. On September 22, 2020, a hotline report was received by DCFS indicating that there was a physical fight in the home where Regina was the aggressor. The hotline report alerted the intact caseworker to the family's whereabouts. At the time of the hotline report, the makeup of the home included Emma H., Regina, and Regina's siblings—16-year-old E.H., also pregnant at the time, and 13-year-old W.H. Additionally, Regina's minor children, R.R. and T.R., resided in the home.

¶ 10     Rieck testified that the hotline report relayed that a fight started in the home because R.R.'s hand had been hurt in a door. Regina had hit and poured oil on W.H. At that point, E.H. intervened, and Regina struck her in the stomach. Police also observed Regina striking Emma H. while holding T.R. The fight resulted in Regina's arrest and juvenile charges being filed against her in Vermilion County case 2020-JD-78. At that time, DCFS removed R.R. and T.R. from the home. Rieck testified that Emma H.'s home was not an appropriate placement for R.R. and T.R. due to the past history of abuse and neglect, the fact that Emma H. had two pending DCFS investigations, and that Emma H. had been unsuccessful in her intact case. Despite DCFS's assessment that the home was unsuitable for R.R. and T.R., Regina's two minor siblings were left in the home. DCFS did not remove and the State did not file a petition alleging that Regina and her siblings were abused, neglected, or dependent, despite residing in the same home as R.R. and T.R.

4

¶ 11    After the shelter care hearing, the circuit court entered a temporary custody order, finding that there was probable cause to believe that R.R. and T.R. were neglected and that the removal of the minors from the home was an urgent and immediate necessity. The circuit court granted custody and guardianship of the minors to DCFS, who placed them in a traditional foster care placement. DCFS filed a parent-child visitation plan on October 5, 2020. The visitation plan indicated that visits would be supervised; however, the days and times of visits as well as the location were marked: "To be determined."

¶ 12    The circuit court entered an order of adjudication on October 16, 2020, after Regina entered into a stipulation that the minors were not receiving the proper and necessary support or other remedial care necessary for their well-being because Regina had participated in domestic violence within the home. Regina also stipulated that the minors were in an injurious environment for the same reason. Based on Regina's stipulations, the circuit court found that the minors were neglected.

¶ 13    DCFS filed a dispositional report on November 12, 2020. The report indicated that Regina was living in her mother's home, participating in school remotely, and was having one weekly supervised visit with her children at a DCFS office. DCFS had not yet completed an integrated assessment. The dispositional report indicated that once DCFS completed an integrated assessment, the recommendations from the assessment would be added to the service plan. A service plan had not been filed; however, the dispositional report indicated that Regina would need to (1) address her violent and unpredictable behavior, (2) obtain and maintain a home free from violence, (3) address her mental health issues, and (4) provide a safe and stable environment for her children.

5

¶ 14    The circuit court held a dispositional hearing on January 8, 2021. At the dispositional hearing, Regina, through counsel, "agree[d] with the recommendations" contained in the December 7, 2020, dispositional report filed by DCFS. As such, the circuit court entered a dispositional order, making the minors wards of the court. The circuit court found that Regina was unfit or unable, for reasons other than financial circumstances alone, to care for, protect, train, or discipline the minors or was unwilling to do so, and placed R.R. and T.R. in the custody and guardianship of DCFS. The circuit court further found that the service plan was appropriate and that the services which had been delivered and were to be delivered were appropriate, despite the fact that there was no integrated assessment or service plan on file, and no testimony regarding the services which had been or would be provided. No mention was made of the appropriateness of 15-year-old Regina's living conditions in the home of Emma H.

¶ 15    An integrated assessment was completed on January 8, 2021, and filed on January 11, 2021. Regina was first interviewed for the assessment on December 16, 2020, approximately three months after the minors were removed from her care. The assessment indicated that Regina had been an indicated victim on five occasions and had two pending cases where she was named as the victim. The assessment did not indicate why Regina had not been removed from Emma H.'s home and the pending cases were not addressed again during this matter.

¶ 16    The integrated assessment recommended that Regina participate in individual psychotherapy in order to process and resolve traumatic experiences and understand their present impact. The assessment further recommended anger management counseling and that Regina should accept responsibility for her behavior, engage in parenting education and coaching, and communicate with her permanency worker.

¶ 17    A permanency report was filed by DCFS on June 28, 2021. The report indicated that Regina, now 16 years old, had been living with her 18-year-old boyfriend, and the father of R.R. and T.R., at his mother's home for much of the reporting period. His mother passed away on May 20, 2021, requiring Regina to relocate. Regina did not wish to return to her mother's home due to it being a negative environment; however, DCFS reported that "no other suitable living arrangement has been identified." A multi-agency staffing was held to discuss Regina's housing needs on June 28, 2021, but it was determined that since "she [was] a minor, her mother [had] the right to determine where she live[d]." The report indicated that Emma H.'s high-risk intact case was closed unsuccessfully in March 2021, due to her refusal to cooperate with DCFS. Further, Emma H. had been impeding Regina's progress in her own case by being threatening and uncooperative with DCFS. DCFS indicated that Emma H.'s home "would not be a suitable location to return [R.R.] and [T.R.] to due to conflict in the home between [Emma H.] and her children, [and] [Emma H.'s] previous behavior or failure to cooperate with the Department and threats she has made." The report further indicated that Emma H. was reporting that she and some relatives would try to force Regina to return to Emma H.'s home in Charleston. Despite the unsuccessful outcome of the high-risk intact case and the safety assessment by DCFS, Regina was returned to the home of Emma H., and her siblings also remained in Emma H.'s home. DCFS noted that it had no legal relationship with Regina and was unable to assist her in finding another option for housing without Emma H.'s consent. The report did not note any housing options that had been identified or whether or not Emma H. would consent to Regina living in the same.

¶ 18    The permanency report indicated that although Regina reported that she was attending school remotely the previous semester, she did not complete any classes. She had attended some parenting classes but needed to complete a mental health assessment and participate in anger

7

management. Due to a waiting list at the agencies in Vermilion County, those services had not yet been provided by the agency.

¶ 19  The permanency report recommended that the circuit court find that Regina had made reasonable efforts toward the return of the minors by consistently engaging in visitation with R.R. and T.R. The report recommended that the circuit court find that Regina had not made reasonable and substantial progress toward the return of the minors as she had not engaged in all of the recommended services, had fallen behind educationally, and was a minor herself with inadequate support for her educational, financial, and emotional needs. The report further recommended that the circuit court find that the services required in the service plan were appropriate and reasonably calculated to facilitate and achieve the permanency goal and that the services required had been provided, despite the fact that the report indicated there was a waiting list to engage in the necessary services.

¶ 20  The CASA filed a report on June 29, 2021. The report indicated that Regina was behind in her schoolwork and would be returning to live with her mother. Regina had engaged in parenting classes and was on a waiting list for a mental health assessment and anger management classes. The CASA observed that Regina was engaged with her children, attentive and affectionate. The CASA further recommended that Regina undergo a life skills assessment to determine if they could obtain services directed at building life skills for independent living. It does not appear that the recommendation was ever adopted by DCFS.

¶ 21  On July 9, 2021, the circuit court held a permanency hearing, setting a goal of return home within 12 months. Respondent's counsel indicated that Regina "agrees with the recommendations in the report." The guardian *ad litem* indicated that he had concerns about where Regina was living and wanted to ensure that it was safe for her. The circuit court was advised that Regina was going

8

to live with a friend of her boyfriend's deceased mother, Lisa. Lisa had previously fostered a mother and her children, and therefore, the living situation could promote the goal of return home. The circuit court indicated that it would enter a permanency order consistent with the recommendations contained in the June 28, 2021, permanency report. The circuit court entered a permanency order finding that Regina had not actively engaged in services, despite the report's indication that she had engaged in the services that had been provided. The circuit court further found that Regina had not made reasonable efforts or reasonable and substantial progress toward returning the minors home, despite the report's indication that Regina had made reasonable efforts. The circuit court found that the services contained in the service plan, which had not been filed or testified to, were appropriate and reasonably calculated to facilitate achievement of the permanency goal of return home, and that the services had been provided, despite the report's indication that there was a "waitlist at the agencies that provide counseling in Vermilion County. Resources for counseling will continue to be explored." DCFS was ordered to provide a copy of the service plan to the circuit court, all parties, the CASA, and all counsel at least 14 days prior to the next hearing, scheduled for January 14, 2022.

¶ 22 DCFS filed a permanency report on January 5, 2022. While there was still no service plan on file, the report indicated that Regina had a service plan which indicated that she should (1) complete a mental health assessment and any recommended services; (2) engage in parenting services; (3) meet with her caseworker monthly; (4) attend an education program; (5) maintain stable, substance-free housing; and (6) maintain adequate income for herself and the children. The report indicated that Regina had chosen to return to Emma H.'s home. The home was still assessed as an unsuitable location to return R.R. and T.R., and due to threats that Emma H. had made toward

9

DCFS staff, the caseworker would not visit the residence and "is, therefore, unable to assess the home for safety."

¶ 23    The report indicated that Regina relied on her mother to make contact with her caseworker, ask questions, and to find out what was in her service plan. The report, however, also indicated that Regina had been provided with a service plan and had discussed it with her caseworker. Regina dropped out of high school and was attending a general educational development (GED) program through a community college. At the time of the report, Regina was not employed. The CASA provided Regina with a bicycle to assist her in getting to a job or service appointments. Regina attended parenting classes and the instructor reported that Regina was engaged and attentive in the service. Regina obtained a mental health assessment in September 2021. While Regina had attended therapy, she had recently missed two appointments and would need to access services through a drop-in program to see a therapist. Regina was still being provided with one weekly visit with R.R. and T.R., during which it was reported that she was attentive and affectionate to her children and often provided the children with meals or snacks.

¶ 24    DCFS recommended a goal of return home in 12 months. DCFS recommended that the circuit court find that Regina had not made reasonable efforts as she was not able to provide the children with a safe and stable home. DCFS recommended that the circuit court find that Regina had not made reasonable progress in that she had not fully engaged in her recommended services and had not made adequate progress to address her educational, financial, or emotional needs. DCFS further encouraged the circuit court to find that the services contained in the, still unfiled, service plan were appropriate and reasonably calculated to facilitate the achievement of the permanency goal and had been provided.

¶ 25    The CASA filed a report on January 11, 2022, which indicated that Regina would begin attending GED classes on January 20, 2022. The report indicated that Regina was participating in parenting coaching and consistently attended and appropriately engaged with her children during visits.

¶ 26    On January 26, 2022, DCFS filed a family service plan dated September 21, 2021. The plan indicated that Regina received the service plan on September 23, 2021. The service plan required Regina to cooperate with the agency, obtain mental health services, engage in parenting education with coaching, maintain safe and stable housing, obtain a legal means of income, and continue her education.

¶ 27    On February 8, 2022, DCFS filed an amended permanency report. The report was updated to indicate that after a court date on January 18, 2022, Emma H. was overheard saying: "I have a machete and a gun at my house so if they set foot on my property, I'm going to take 'em all down, DCFS, attorneys, the Supreme Court." It does not appear that the caseworker reported the threat to the police and, again, allowed Regina to return to her mother's home.

¶ 28    The report indicated that a barrier to the minors' return to their mother was her lack of understanding or acknowledgement of the violent dynamics in her living arrangement, including the threats her mother continued to make toward department staff, attorneys, and the Supreme Court. The report indicated that because DCFS had no legal relationship with Regina, the agency was unable to assist her in finding another option for housing without Emma H.'s consent. The report indicated that DCFS would send the case to legal screening once R.R. and T.R. were moved to an adoptive placement. The report indicated that Regina had not made sufficient progress toward the return of R.R. and T.R., in that she had not made adequate progress to address or acknowledge the ongoing need to provide her children with a safe and stable environment.

¶ 29    The report further stated that: "[d]ue to [Regina's] age, she is dependent on her mother for food and shelter." The report indicated that DCFS had added Emma H. to the service plan and required her to engage in a mental health assessment, a substance abuse assessment, and cooperate with random drug screens. The report indicated that Regina had successfully completed anger management, had enrolled in GED classes, and had begun attending again on January 13, 2022. Regina had also completed her mental health assessment and was engaged in counseling. The author of the report expressed concern that Regina was not able to acknowledge or take responsibility for the violence in the home, which she perpetrated, that caused R.R. and T.R. to come into care. The report indicated that the agency would contact and encourage the therapist to address those issues with Regina. Regina was consistent in attending her visits and properly cared for R.R. and T.R. during the visits. The permanency report recommended that the circuit court find that Regina had made reasonable efforts but not substantial progress toward the goal of return home.

¶ 30    On February 18, 2022, the circuit court held a permanency hearing. Regina's counsel indicated that Regina would stipulate to the DCFS permanency report filed in February and would not offer additional evidence or testimony. Counsel for Regina argued that Regina had made reasonable progress toward the goal of return home. Counsel argued that Regina had participated in services and visits, and as a 16-year-old child, was doing well. Counsel, at the request of Regina, also requested that R.R. and T.R. be returned home that day. The circuit court pointed out to Regina that she was not taking accountability for her violent actions and did not understand how her behavior could affect her children. Regina answered the circuit court, stating as follows:

    "I had already talked about all of this in the team meeting that I had. I had moved past all of that. I have took responsibility for my actions and how they can affect my babies. I

12

moved past that. I don't have a problem with my family at all. I'm to myself and I'm way calmer. I don't have a problem with that."

¶ 31 The circuit court indicated that the return home request would be denied. The reason for the denial was that there were too many issues in the home. The circuit court went on to note: "frankly, not necessarily issues that you're causing or that you're part of, but there are issues related to violence present in the home." The circuit court found that Regina was engaged in services and had made reasonable efforts, but had not made reasonable progress. The circuit court acknowledged that Regina was still dependent on her mother, and that Emma H. was creating issues in the case. Emma H. indicated that she had been cooperative, had welcomed the agency to her home, and had kept her other grandchild and a nephew in her home throughout the summer. The circuit court set a short date as it believed that the case was getting closer to the goal of return home and wanted to check the status in three months.

¶ 32 The CASA filed a report on May 9, 2022. The report indicated that the caseworker and the CASA went to Emma H.'s home on May 4, 2022, to observe the conditions of the home in an effort to conduct future visitation in the home. The home was observed to be "unsuitable to the health and emotional requirements of two small children." The home was heavily cluttered with papers and bags on the floor. The room planned to be used for R.R. and T.R. was dirty and unfurnished with torn carpet and being used to house a medium-sized dog that was defecating in the room. Regina, now 16 years old, was unemployed but was attending GED classes; participating in parenting coaching; had completed anger management and mental health services; and was consistently attending her visitation and was appropriately engaged at the visitation. The CASA commended Regina's completion of services, however, was concerned about her lack of income

and appropriate housing. Based on that, the CASA recommended a goal change to substitute care pending court determination of termination of parental rights.

¶ 33    DCFS filed a report on May 11, 2022. The report indicated that Regina had completed her services contained in the service plan other than obtaining housing, income, and her GED. Emma H. had completed the requested assessments and there were no recommendations for services. Emma H. had missed random drug tests, one due to being in surgery and one due to being hospitalized. There were unannounced visits to the home on three occasions between March 2022 and May 2022. There was an area of the home that the workers were not allowed to access because there were expensive guitars and musical equipment in that area. There were two dogs in the home with dog feces present on the floor. There was old food on the counters and stacks of dishes in the sink. Regina's room was cluttered with clothing and items on the floor. The home was considered "unsanitary and unacceptable for visits at that time." The home remained in similar condition throughout the visits, despite the parties being advised that the home would need to be cleaned and beds and a sanitary environment provided for R.R. and T.R. to begin visits there. Regina turned 17 years old on March 13, 2022. The caseworker was concerned that there were no notable improvements made in the condition of the home, even in Regina's bedroom. Regina had not attempted to find employment. The report suggested that Regina had not made reasonable progress in that she had failed to address the conditions of her home. DCFS recommended a goal of return home in 12 months.

¶ 34    On June 17, 2022, the circuit court held a status hearing. At the hearing, Regina requested a new attorney, stating that she believed that her attorney and caseworker were trying to blackmail her. She explained that she was told that in order for her children to be returned to her, she would need to move to a residential program that was three hours away where she could participate in

14

services and increase visitation with her children. Regina was concerned that she would have to relinquish her cellular telephone and laptop, follow the rules, and go to church, which were all things that she did not want to do. Regina explained that she had been told that she would not have her children returned if she stayed in the house with her mother. The circuit court denied Regina's request for new counsel. The circuit court agreed that, as a minor, Regina had done everything that she was supposed to do; however, the circuit court indicated that the barrier to reunification was the home that Regina was living in.

¶ 35     On August 17, 2022, DCFS filed a permanency report. The report indicated that Regina had completed or was still engaged in all of her services. Regina had begun working at McDonald's, but her employment ceased shortly thereafter. A meeting was held on June 13, 2022, to discuss possible housing options for Regina to live independently with her children. As a 17-year-old minor, the caseworker admitted that few residential programs were available. A faith-based Christian program was identified by R.R. and T.R.'s foster parents that was willing to house Regina. Regina was concerned about having to move from her mother's home and relinquishing her cellular telephone and, thus, was not interested in exploring the program further. It was noted that the foster parents were now willing to adopt R.R. and T.R. in the event that they were not returned home. DCFS recommended a finding of no reasonable efforts and a permanency goal of return home in 12 months.

¶ 36     On August 23, 2022, the State filed a motion for termination of parental rights, alleging that Regina was an unfit person as defined in the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2022)). The State alleged that Regina was unfit based on her failure to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare pursuant to section 1(D)(b) of the Adoption Act (*id.* § 1(D)(b)). Further, the State alleged that Regina was unfit based on her failure

to make reasonable efforts to correct the conditions that were the basis of the removal of the children from her during any nine-month period between November 22, 2021, through August 22, 2022, pursuant to section 1(D)(m)(i) of the Adoption Act (*id.* § 1(D)(m)(i)). Finally, the State alleged that Regina was unfit based on her failure to make reasonable progress to correct the conditions that were the basis of the removal of the minors from her during the same timeframe, pursuant to section 1(D)(m)(ii) of the Adoption Act (*id.* § 1(D)(m)(ii)).

¶ 37    On November 23, 2022, the circuit court held a hearing on the fitness portion of the State's petition for termination of parental rights. The State called Kathleen Davis to testify. Davis testified that she was a child welfare specialist with DCFS and was the caseworker in the present case throughout the proceedings. Davis stated that the integrated assessment was completed prior to the dispositional hearing and filed with the court within about 30 days. Davis testified that the service plan primarily comes from the integrated assessment. The State presented a service plan filed January 26, 2022, and admitted the same into evidence as People's exhibit 1. Davis testified that the initial service plan was filed within 45 days of the minors coming into care and is typically less specific. A second service plan would have been prepared in October or November of 2020, which would have contained more specific services, and then the September 2021 plan would come later.[3]

¶ 38    Davis testified that Regina was to complete parenting education and coaching; a mental health assessment and any recommendations for service; comply with the conditions of juvenile probation, including anger management classes; provide stable, safe housing; and earn adequate income. Regina was also required to engage in appropriate visitation with R.R. and T.R. and

---

[3]No other service plans appear in the record on appeal and no additional service plans were admitted into evidence.

16

continue her education. Davis testified that Regina successfully completed psychotherapy after a mental health evaluation and anger management. Davis felt like the counseling failed to address Regina's understanding of the conditions that led to the minors' removal from the home, violence within the home, and Regina's own past trauma. Davis, however, testified that the mental health provider, Life Links, and Regina both felt that they had addressed those issues. Life Links rated Regina's progress as satisfactory and successfully discharged her. Davis testified that she informed Regina that she still had concerns with those areas of lack of insight and addressing past trauma; however, further services were not provided.

¶ 39    Davis further testified that Regina participated in parenting classes and the classes were successfully completed. Davis had concerns that the visits did not progress beyond two-hour supervised visits in the community, so she was never able to assess a full care routine. The parenting classes were satisfactory as far as they had progressed, in that Regina had good skills with her children and did very well in the context of the visits. Davis testified that Regina had made "substantial efforts and satisfactory progress" in this area for the specified time period for purposes of termination of parental rights.

¶ 40    Davis testified that Regina maintained successful communication with her caseworker during the specified time period and complied with all aspects of visitation. The issue with increasing visitation was that Regina, as a minor, did not have adequate and safe housing where the visits could occur. Davis testified that Regina made efforts to maintain safe and stable housing, but they were not substantial. Davis testified that DCFS was not able to go into the home for a period of time because Emma H. had threatened caseworkers; however, the agency was eventually able to conduct unannounced visits on three occasions. During the first visit there were sanitary concerns including food left out, two dogs in the house with one potentially aggressive toward

17

strangers, and dog urine and feces on the carpet. The conditions were determined to be unsafe for the visits to occur. While the conditions had improved somewhat during subsequent visits, the house was still deemed unsafe for the visits to occur.

¶ 41    Davis went on to state that on June 13, 2022, she met with Regina to discuss alternative housing. The minors' foster parents had identified a program in their community where Regina could live; however, there were no openings in the program near their home. There was a similar program in Joliet, Illinois, that did have openings. Regina discussed the program with the director and ultimately was uncomfortable moving to a location where she did not know anyone and would not have her cellular telephone or have access to the outside world. Regina was not interested in exploring the program further as it was too far from family and would be uncomfortable. Davis testified that Regina, during the relevant time period, did not make reasonable efforts or substantial progress toward maintaining a stable home or legal means of income. Regina was solely supported by her mother. Davis testified that Regina had informed her that day that she had recently begun working at a pizza restaurant. Davis testified that she had explored options for Regina to become emancipated, however, informed Regina that she would have to demonstrate to a judge that she could support herself, and that she could support her children without her mother's help. Regina expressed a desire to be on her own several times throughout the pendency of the case. Nonetheless, Davis testified that due to the inability to provide a safe and stable home environment for the children, Regina had not, in Davis's opinion, made reasonable efforts or progress toward the return home of R.R. and T.R.

¶ 42    During cross-examination, Davis admitted that Regina would not be capable of renting her own home due to her age and was therefore dependent on her mother for her housing. Davis testified that during the last home visit, there was a room prepared for R.R. and T.R. which was

18

newly carpeted, or the carpet had been cleaned, and there were beds that Regina had procured for the minors. There were no problems with the room. Davis still felt the home was too cluttered for visitation to occur there.

¶ 43 The guardian *ad litem* inquired why the home, at present, was safe for 17-year-old Regina and not R.R. and T.R. Davis explained that the environmental issues were a concern for toddlers, but that Regina would be able to make reasoned decisions about not eating spoiled food that was left out or interacting with feces and urine on the floor. Davis testified that during the initiation of the case, there were conversations about whether the home was safe for Regina and her siblings, which Davis was not included in. Davis testified that while she did not make the initial decision not to remove Regina from her mother's care, she did not feel like Regina was currently unsafe in her mother's home. Nonetheless, Davis admitted that if protective custody had initially been taken of Regina, then she would have been eligible to be placed in safe housing that would have met her needs, in a specialized foster home or teen parent group home, where she and her children could have resided together.

¶ 44 Next, Regina testified on her own behalf. Regina stated that she was currently 17 years old, and her children were 2 and 3. She lived with her mother but had been working on the house herself to make it suitable for R.R. and T.R. Regina had laid new carpet in the minors' room and had the carpets professionally cleaned. Regina obtained beds for the minors from the Salvation Army. Regina testified that the minors would not need to go into the basement, as the largest living space in the home was upstairs, where the living room, kitchen, and three bedrooms were located. Regina testified that there were no drugs or alcohol in the home, and that she had successfully completed probation for a battery charge stemming from the fight that brought the minors into care. She also stated that she had recently obtained employment at a pizza restaurant.

¶ 45    Regina testified that prior to the minors coming into care, Regina cared for them, ensuring that they had what they needed and taking them to the doctor regularly. She had successfully obtained public aid to obtain their food and basic needs such as diapers and supplies. Regina acknowledged that on the day the minors were taken into care, her behavior was "out of line." She testified that she worked through some of those feelings in anger management classes, focusing on how to control her anger and recognized how it could affect R.R. and T.R. She had not had any outbursts since taking the classes and acknowledged that on the day that she was in the fight with her family, it was not a safe environment for her children.

¶ 46    Regina testified that she attended GED classes two nights a week for four hours at a time, and sometimes stayed for extra help. She had worked on preparing to take the four required tests to obtain her GED, and the only barrier to taking the tests was her nervousness or anxiety that she may not pass. Regina planned, after getting her GED, to go to the local community college to study cosmetology or cooking school. Regina had looked into ways to move out of her mother's house before she turned 18. She felt uncomfortable with the home located by the minors' foster parents, Under His Wings, because she was fearful of going to a different town, alone, with no contact with anyone she knew, and away from her GED classes. She worried about not having her cellular telephone because she would not be able to contact her attorney, her mother, or her caseworker. Regina testified that she did call other places on her own in the town she lived in, such as Hope House and another home. All of the places, however, that she had called required her to be 18 years old to move in. Regina testified that when she turned 18, she planned to move into her own home.

¶ 47    Regina further testified that the minors' foster parents had offered for her to live with them "when things got better" and that she would have been okay with that. She explained that she was

not able to do that during the case because DCFS would not allow her to stay in the same home with the minors. She said that if DCFS had allowed her to, she would have definitely gone to live with the foster family and her children. Upon completion of the hearing, the circuit court found Regina to be an unfit person as defined in section 1(D)(m)(ii) of the Adoption Act (*id.*) for failing to make reasonable progress toward return of the minors to the home.

¶ 48    On January 25, 2023, the circuit court held a best interest hearing. Kathleen Davis again testified, stating that the minors had been in the same foster home since they were taken into protective custody. Davis testified that she had observed the minors in the foster home three to four times, and that another caseworker closer to the home visited often as well. Davis testified that R.R. and T.R. had a loving relationship with the foster family, including their four biological children. R.R. and T.R. were affectionate with their foster family and comfortable in the home, which provided them with all of their needs. The foster parents were initially hesitant to adopt; however, they had been excited for several months prior to the best interests hearing to adopt the children. The foster parents were committed to providing long-term care and had provided a stable and loving environment for R.R. and T.R. Davis testified that Regina, at the time of the best interest hearing, had been living in an apartment for about a week, and was no longer living with her mother. Davis testified that the new apartment was a safe and appropriate place for children to live.

¶ 49    Regina testified that she had saved $1300 and had moved into an apartment with a friend. She contributed to the rent with money earned from her job at Domino's pizza, where she had worked for a month and a half. Due to her age, Regina was not able to obtain housing on her own and was ineligible for certain government programs that would help her to provide for her children. Regina had been working toward taking the four tests to obtain her GED; however, she had not

taken any tests yet. Regina testified that she loved her children and was doing her best to reunite her family.

¶ 50    Regina's counsel then argued that now that Regina was in appropriate housing, the circuit court should continue the case for another six months. Counsel argued that the additional time would allow Regina to demonstrate that she could parent her children independently. Regina would turn 18 years old in March and would become eligible for government assistance and housing.

¶ 51    The circuit court stated that R.R. and T.R. had been in care for approximately 850 days. The circuit court noted that alternative living situations had been presented in the past and that Regina refused them. The circuit court pointed out that at 17 years old, Regina had dropped out of school, had yet to take her GED, and had not been employed for most of the pendency of the case. Further, the circuit court noted that Regina could have taken control of some of the issues in her past living situation, by cleaning up the house on her own. The circuit court commented that it did not believe another six months would realistically change the circumstances before it, and, considering the best interest factors, found that it was in the minors' best interests to terminate Regina's parental rights. Regina filed a timely notice of appeal.

¶ 52                                    II. ANALYSIS

¶ 53    Before proceeding with our analysis of this matter, we first address the timeliness of our decision. The matter at bar is subject to an expedited disposition pursuant to Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). Rule 311(a)(5) requires us to issue our decision within 150 days after the filing of the notice of appeal, except where good cause is shown. Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). The trial court's final judgment was entered on January 25, 2023, and the

respondent filed a notice of appeal on January 27, 2023. As such, this court was required to issue our decision by June 26, 2023, unless good cause is shown.

¶ 54    The record on appeal in this case was filed on February 21, 2023, and briefs were filed by the respondent/appellant on March 14, 2023, and the State/appellee on March 30, 2023. On June 22, 2023, this court ordered the respondent/appellant to rebrief the issues, finding that the initial brief did not clearly delineate whether the respondent was appealing the circuit court's findings regarding unfitness, best interests, or both. The respondent/appellant requested an extension of time for rebriefing, which was granted. The respondent/appellant filed a supplemental brief on July 27, 2023, and the State/appellee's responsive brief was filed on August 17, 2023. Under these circumstances, we find good cause for issuing our decision after the 150-day deadline contemplated by Rule 311(a)(5).

¶ 55    On appeal, Regina argues that the circuit court's findings that Regina was an unfit person, and that it was in the best interests of R.R. and T.R. to terminate her parental rights, were against the manifest weight of the evidence. Regina argues that, at the time of the best interests hearing on January 25, 2023, Regina was still taking significant steps to create a safe and stable home for the minor children. According to Regina, despite being only 17 years old at the time, she was consistent and conscientious in her efforts to maintain visitation and establish a loving relationship with her children. Regina argues that the testimony and evidence presented established that she was willing to take the steps necessary for her to establish a safe and permanent home for her children, and that her request for an additional six months to show her progress to the circuit court was not unreasonable.

¶ 56    Regina further argues that the limitations on her ability to provide safe and stable housing on her own, as well as providing financial stability, was hindered by her age, and was exacerbated

by DCFS's failure to remove her from the home of her mother at the same time of the removal of her own minor children from the same home. Regina argues that her age should have been considered in determining whether she had made reasonable efforts during the alleged nine-month period.

¶ 57    While the circuit court's order filed on January 25, 2023, indicates the circuit court found that Regina had not made reasonable efforts toward returning the minors home, the circuit court's oral pronouncement went only to reasonable progress. The circuit court stated: "I'm not going to make any additional finding as it related to the efforts, though I do believe that would be a much more difficult question for me to answer today." Where the oral pronouncement of the circuit court and the written order are in conflict, the oral pronouncement controls. *In re R.W.*, 371 Ill. App. 3d 1171, 1173 (2007). The circuit court found only that Regina was unfit based on a failure to make reasonable progress. Thus, we will focus on Regina's argument that the circuit court should have considered Regina's age and how that related to the finding that she failed to make reasonable progress during the alleged nine-month period, from November 22, 2021, to August 22, 2022.

¶ 58    Termination of parental rights proceedings are governed by the Act (705 ILCS 405/1-1 *et seq.* (West 2022)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2022)). *In re D.T.*, 212 Ill. 2d 347, 352 (2004). A petition to terminate parental rights is filed under section 2-29(2) of the Act, which delineates a two-step process to terminate parental rights. 705 ILCS 405/2-29(2) (West 2022). The State must first establish, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)). 705 ILCS 405/2-29(2), (4) (West 2022); *In re J.L.*, 236 Ill. 2d 329, 337 (2010). When a parent appeals the circuit court's findings that a parent is unfit and that terminating the parental rights is in the child's best interest, the appellate court must not retry the

24

case but, instead, must review the circuit court's findings to determine if the findings are against the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31.

¶ 59                                    A. Fitness Hearing

¶ 60    We first review the evidence to determine if the State met its burden of proving, by clear and convincing evidence, that Regina was an "unfit person." The circuit court determined that the State had met its burden of proof that Regina failed to make reasonable progress toward R.R. and T.R.'s return home within the specific nine-month period from November 22, 2021, through August 22, 2022.

¶ 61    The term "reasonable progress" requires an objective determination regarding the amount of progress based upon the conditions existing at the time the minor child's custody was removed from the parent. *In re P.S.*, 2021 IL App (5th) 210027, ¶ 37. The finding of reasonable progress requires measurable or demonstrable movement toward the goal of reunification. *Id.* Reasonable progress exists when the trial court can conclude that it will be able to return the child to the parent in the near future. *Id.* A parent does not have an unlimited amount of time to make reasonable progress toward the return home of the children. *In re Grant M.*, 307 Ill. App. 3d 865, 871 (1999).

¶ 62    Our supreme court has held that the benchmark for measuring reasonable progress "encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known, and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001). The circuit court, in determining reasonable progress, must consider the circumstances surrounding the removal of the children; the reality that the conditions causing the removal may not be the most serious condition which must be corrected;

the role of the service plans in addressing these conditions; and the parent's concern that her rights will not be terminated lightly. *Id.* at 214.

¶ 63　In order to determine whether the circuit court's finding of unfitness for failure to make reasonable progress was against the manifest weight of the evidence, we consider Regina's service plan and the circuit court's directives solely for the period listed. A "service plan" means "a written plan on a form prescribed by [DCFS] in the plan toward the permanency goal for the children required by 42 USC 675(5), 325 ILCS 5/8.2, and 89 Ill. Adm. Code 315 (Permanency Planning)." 89 Ill. Adm. Code 301.20 (eff. May 3, 2019). The initial service plan is to be completed and forwarded to the circuit court no later than 45 days after placement and must be reviewed at least once every 6 months thereafter. 89 Ill. Adm. Code 315.130(c)(2) (eff. Dec. 31, 2015). We note that in the present case, the initial service plan should have been forwarded to the circuit court, based on the September 25, 2020, shelter care order, on November 9, 2020. The service plan, however, was not provided to Regina until September 23, 2021, a year after R.R. and T.R. were placed in foster care. The service plan was not forwarded and filed with the circuit court until four months after that, on January 26, 2022.

¶ 64　Such failure was certainly relevant to the circuit court's findings at the various permanency hearings regarding whether DCFS had made reasonable efforts to facilitate the achievement of the permanency goal. We acknowledge that, despite the statute's use of the word "shall" regarding the preparation and filing of a service plan, Illinois courts have classified the filing requirement for a service plan as "directory" as opposed to "mandatory." *In re L.O.*, 2016 IL App (3d) 150083, ¶ 21. A directory provision serves to guide an agency's decision, and failure to abide by a directory provision may be overturned if the due process rights of the impacted individual were violated. *Stull v. Department of Children & Family Services*, 239 Ill. App. 3d 325, 332 (1992). The time

26

limitations set forth in statutes and administrative rules, at the very least, reflect the judgment of the legislature and the agency as to what constitutes a reasonable length of time in which the agency must act. *Id.* at 334.

¶ 65    In the present case, Regina, through counsel, never objected to the lack of a service plan in the circuit court, never objected to the sufficiency of the services offered, and never challenged a permanency order by filing a petition pursuant to Illinois Supreme Court Rule 306, regarding appeals from interlocutory orders. Ill. S. Ct. R. 306(a)(5), (b)(1) (eff. Nov. 1, 2017); see also *In re Curtis B.*, 203 Ill. 2d 53, 63-64 (2002) (under Rule 306(a)(5), a party who wishes to petition the appellate court for leave to appeal a permanency order may do so). We review Regina's reasonable progress while mindful that no service plan was filed until the beginning of the State's alleged nine-month period for purposes of determining reasonable progress.

¶ 66    In the present case, R.R. and T.R. were removed from Regina's home during a violent incident that occurred between Regina, her sister, and her mother, when Regina was a 15-year-old child. There were no further violent incidents during the pendency of this case, and Regina successfully completed her probation requirements. The service plan required Regina to (1) cooperate with service plan development; (2) attend court hearings; (3) participate in mental health services, including anger management; (4) participate in parenting education; (5) continue her education; (6) provide adequate income; and (7) provide stable housing to safely meet her children's needs.

¶ 67    Regina was cooperative with DCFS and the service planning, and regularly attended court hearings. She successfully completed anger management and psychotherapy sessions with her mental health provider. The parties all agreed that the main barrier to the return home of R.R. and T.R. was Regina's inability to obtain stable housing. A child herself, Regina made some efforts to

27

remove herself from her mother's home prior to the alleged nine-month period. She moved in with her boyfriend's mother until she passed away. For a short time thereafter, Regina moved in with a family friend in Danville, but ultimately returned to her mother's home in August 2021.

¶ 68    While living in her mother's home, Regina participated in, and received, positive reports from her parenting education, coaching, and visits with R.R. and T.R. During the visits, which were conducted for two-hour periods once per week in the community, Regina was loving and attentive and provided appropriate care for her children.

¶ 69    Due to Regina's progress, the circuit court granted DCFS discretion to move toward unsupervised visitation on February 22, 2022. In an effort to assess the safety of Regina's mother's home for visitation, DCFS conducted unannounced visits to Emma H.'s home on March 21, 2022, April 25, 2022, and May 4, 2022. After the first visit, DCFS informed Regina of improvements that would need to be made prior to visitation occurring in the home. Items that would need to be cleaned included dog feces on the carpet and food left out on the counters. Throughout the visits, environmental and sanitary issues improved but persisted, including the presence of potentially aggressive dogs, the presence of dog urine and feces in the carpet, a lack of beds for R.R. and T.R., and old food and trash present on the counter and stove in the kitchen. Despite some improvement between the first visit and the last visit, the home was unsanitary on each visit and was deemed unsafe for even a two-hour supervised visit with R.R. and T.R.

¶ 70    The circuit court found that Regina had not made reasonable progress relating to her parenting, where, due to Regina's housing, there was no opportunity for her to show the ability to parent during unsupervised visits for longer periods of time, as would be necessary for a finding that return home was imminent. The circuit court further found that Regina had failed to make reasonable progress in providing safe and stable housing. At the time of the fitness hearing, Regina

28

had only had a job for two weeks. While Regina was taking GED classes in an attempt to further her education, she had not progressed much toward that goal, having studied for a year yet failed to take any of the four tests required to finish the program.

¶ 71 The circuit court did consider Regina's age and her unique challenges based on her age and lack of a support system. The circuit court acknowledged that Regina could not, on her own, enter into any rental agreement for housing or obtain housing through government assistance programs. Nonetheless, the circuit court found that potential progress could have been shown by Regina and was not. The circuit court found that Regina failed to clean the home, or even her own room, despite being given directions from DCFS, and that such failure was unreasonable, even for a mother of her age.

¶ 72 Further, while DCFS never provided Regina with any options for alternative housing, the foster parents identified and informed DCFS of a residential program willing to provide housing for Regina, where R.R. and T.R. could safely visit more often. The program was a Christian home for girls called Under His Wings. The program would house Regina and provide services until she turned 18, when she could avail herself of various government programs and provide for her family on her own. DCFS discussed the program with Regina in June 2022, but Regina ultimately decided not to participate because she was uncomfortable with the program's distance from her home and rules requiring initial relinquishment of her cellular telephone. While the circuit court acknowledged that such a program may have been uncomfortable for Regina due to the distance from her home and family, as well as the lack of a cellular telephone for a period of time, the circuit court ultimately held that uncomfortable decisions needed to be made on behalf of R.R. and T.R. Thus, the circuit court found that Regina had not been able to demonstrate that she could provide a safe and stable home or income in order for R.R. and T.R. to be returned to her home in

the near future. Thus, the circuit court found that Regina had not made reasonable progress toward the goal of return home and found that she that was an "unfit person."

¶ 73 Regina argues that the environment that led to her lack of reasonable progress was created, to some extent, by DCFS's failure to take her into protective custody. Regina correctly points out that the parties to this case recognized that the major barrier to Regina being reunited with her children was her home environment. Regina, having become a mother at 13 and 14 years old, and having her children removed when she was just 15 years old, was dependent on her own mother to provide appropriate shelter and meet Regina's needs. The environmental issues that required the removal of R.R. and T.R. involved the cleanliness of Regina's mother's home, and the threatening presence of Regina's mother within that home. The latter issue caused the agency to feel unsafe even assessing the environment for visitation for a period of time. This court is cognizant that a minor, such as Regina, has little control over the provisions, safety, and security of the home provided by a parent.

¶ 74 While briefly alluded to in the testimony at Regina's unfitness hearing, it is unclear why there was either no investigation by DCFS or an investigation that ultimately determined that Regina was not a dependent or neglected minor herself. Had the agency, the State, or the circuit court determined that Regina was an abused or neglected minor, and that she should be removed from Emma H.'s home and brought into care, the barriers to reunification may have been lessened considerably. Regina would have been eligible for housing and services provided by DCFS as a youth in care, including services available under the pregnant and parenting teens program. Emma H. had multiple indicated reports where Regina was the victim. Emma H. had also absconded with her children during an open intact family case. The intact case stemmed from an indicated report centering around the presence of fentanyl-laced heroin in her home while Regina was present.

30

Emma H. refused to participate in services or cooperate with DCFS despite ongoing safety and sanitary issues in the home, and continued hostility and threats toward DCFS. Nonetheless, Regina remained in her mother's care while her own children were removed from the same environment. While that decision certainly affected Regina's ability to progress toward reunification with R.R. and T.R., that issue is not before this court.

¶ 75 Contrary to Regina's arguments, the circuit court's findings that she failed to make reasonable progress during the alleged nine-month period were clearly supported by the evidence. While we agree with Regina's argument that an inquiry into reasonable progress may well involve considerations of the limitations of the parent (*In re M.S.*, 210 Ill. App. 3d 1085, 1094 (1991)), the circuit court spent considerable time in its pronouncement discussing Regina's age and the services available to her in consideration of the same. Regina was presented with opportunities during the relevant time period to improve the condition of her home through cleaning and sanitation. Regina was 17 years old during the relevant nine-month period. She was presented with an alternative housing option that would have provided a safe environment where visitation, and thus, her demonstration of the ability to parent her children, could have progressed. She refused. Regina was provided with a bicycle to get to and from employment, yet she did not become employed until shortly before the fitness hearing. While Regina was participating in classes to prepare her to earn her GED, Regina did not progress toward earning her GED by testing.

¶ 76 The circuit court considered Regina's age and limitations and lauded her considerable efforts toward her service plan. However, the amount of progress that exists must be determined with proper regard for the best interests of the children and their need for permanency. *In re R.M.B.*, 146 Ill. App. 3d 523, 528 (1986). The circuit court concluded that Regina was unable to make reasonable progress toward reunification with R.R. and T.R. and that, despite the minors being in

31

care for an extensive period of time, the circuit court could not conclude that it would be able to order the children to parental custody in the near future. See *In re D.D.*, 2022 IL App (4th) 220257, ¶ 38.

¶ 77    We have acknowledged, throughout the majority opinion, as our colleague has highlighted in her special concurrence, that official inaction certainly frustrated Regina's parental progress. As pointed out in the special concurrence, Regina was failed by the participants in her family's case, charged not just with ensuring the safety of R.R. and T.R., but with Regina as well. Regina was repeatedly left in the home of Emma H., despite seemingly clear evidence of Regina herself being the subject of abuse, neglect, or dependency. We agree with the special concurrence in that regard.

¶ 78    While we empathize with Regina's personal circumstances, which prevented her from making reasonable progress, we must recognize that reasonable progress is measured by an objective standard. *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991). Our standard of review in assessing the circuit court's findings is whether they were against the manifest weight of the evidence, and we cannot find that the findings were unreasonable, arbitrary, or not based on evidence.

¶ 79    We acknowledge, as the circuit court did, that it is clear that Regina loves her children deeply and desires to care for them. While Regina had displayed continuous effort toward that goal, she simply lacked the ability to make reasonable progress toward their return home. The trial court's finding that Regina failed to make reasonable progress towards reunification was not against the manifest weight of the evidence. Thus, the circuit court's finding is affirmed.

¶ 80                         B. Best Interests Finding

¶ 81    Once the court determines that a parent is unfit as defined by the Adoption Act, the court must decide, based on the evidence presented, whether it is in the best interests of the minor to

terminate parental rights. 705 ILCS 405/2-29(2) (West 2022). "The parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d at 364.

¶ 82 At the best interests stage, the State is required to prove, by a preponderance of the evidence, that the minor's best interests justify termination of the minor's relationship with their parent(s). *Id*. at 366. In meeting its burden, the State must present evidence supporting the best interest factors delineated in section 1-3(4.05) of the Act (705 ILCS 405/1-3(4.05) (West 2022)). A finding that termination of parental rights is in the child's best interest will not be reversed unless it is contrary to the manifest weight of the evidence. *In re M.F.*, 326 Ill. App. 3d 1110, 1116 (2002). A determination is against the manifest weight of the evidence only if the facts clearly demonstrate that the court should have reached the opposite result. *In re D.M.*, 336 Ill. App. 3d 766, 773 (2002). The reviewing court does not reweigh the evidence or reassess the credibility of the witnesses. *In re K.B.*, 314 Ill. App. 3d 739, 748 (2000).

¶ 83 When determining the child's best interests, the circuit court is required to consider, in the context of the child's age and developmental needs, the following:

"(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

33

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West 2020).

¶ 84    "While all of the above-cited factors must be considered, no factor is dispositive." *In re Austin W.*, 214 Ill. 2d 31, 50 (2005). Other important factors include " 'the nature and length of the child's relationship with the present caretaker' and the effect that a change of placement would have upon the emotional and psychological well-being of the child." *Id.* (quoting *In re Violetta B.*, 210 Ill. App. 3d 521, 534 (1991)).

¶ 85    A best interests hearing was held on January 25, 2023, and the circuit court entered an order on that date finding that it was in the best interests of the minors that Regina's parental rights be terminated. As such, the circuit court entered an order that day terminating Regina's parental rights. Regina argues that the circuit court erred in finding that termination of her parental rights was in the minors' best interests. In support of that argument, Regina draws this court's attention to the foster parents' initial reluctance to adopt as well as the minors' love and connection to their

mother. Further, Regina cites the progress she made between the fitness and best interests hearing, despite her age, in addition to the services that would become available shortly after her eighteenth birthday.

¶ 86    In the present case, the evidence demonstrated that R.R. and T.R. had resided with their foster parents for over two years. They were bonded with their foster family, had a strong connection with their siblings, and spent time with the foster parents' extended family members. The foster home was a safe and appropriate setting, and while the foster parents initially supported the goal of return home, they were eager to adopt.

¶ 87    As the circuit court did, we recognize the considerable hurdles that existed for a parenting teen with little support system to independently provide for and parent her young children. The paramount issue, however, remains the best interests and welfare of R.R. and T.R. "A child is no less exposed to danger, no less dirty or hungry because [their] parent is unable rather than unwilling to give [them] care." *In re Devine*, 81 Ill. App. 3d 314, 320 (1980). Here, the circuit court appropriately considered all of the best interests factors and determined that the evidence demonstrated that it was in R.R. and T.R.'s best interests to terminate Regina's parental rights. Therefore, we find that the circuit court's finding that it was in the minors' best interest to terminate Regina's parental rights was not contrary to the manifest weight of the evidence. Having found that the circuit court's findings regarding fitness and best interests of the minors were not against the manifest weight of the evidence, we further find that the circuit court's judgment terminating Regina's parental rights not contrary to the manifest weight of the evidence.

¶ 88                                          C. Continuance

¶ 89    Finally, Regina argues that the circuit court should have "at least considered trial counsel's motion to continue the best interests hearing to a date six months out to give [Regina] more time

35

to demonstrate her compliance [with the service plan]." The continuance would allow more time for Regina to show, after turning 18 years old, that she could support herself and provide for her family, independently, once she had the benefit of resources that would have been available for an adult. The circuit court denied the request, stating that it did not believe that 6 more months would make a difference in Regina's progress and pointed out numerous times that the minors had been in foster care for approximately 850 days.

¶ 90   A party does not have an absolute right to a continuance, and the grant or denial of a motion to continue lies in the sound discretion of the circuit court. *Somers v. Quinn*, 373 Ill. App. 3d 87, 96 (2007). Under an abuse of discretion standard of review, the circuit court's finding will not be disturbed on appeal unless the circuit court acted arbitrarily, without employing conscientious judgment, or whether, considering all the circumstances, the circuit court acted unreasonably and ignored recognized principles of law, which resulted in substantial prejudice. *Petryshyn v. Slotky*, 387 Ill. App. 3d 1112, 1116 (2008).

¶ 91   Here, we do not find that the circuit court abused its discretion in denying a continuance. Under most circumstances, requests for a continuance on the day of trial need not be allowed. *Sinram v. Nolan*, 227 Ill. App. 3d 241, 243 (1992). Here, the request for a continuance was made at the end of the hearing, during arguments. The circuit court considered the progress made by the respondent, and the progress that it believed could reasonably be made in the six months after the hearing if a continuance were granted. The circuit court also considered the lengthy amount of time that the minors had been in foster care. The minors had a right to permanence and stability, and, where Regina could not provide that to them at the time of the best interests hearing, the minors should not have had to wait. The circuit court's order denying the motion to continue the hearing was not an abuse of discretion.

36

¶ 92                                    III. CONCLUSION

¶ 93    Based on the foregoing, we find that the circuit court's denial of a continuance of the best interests hearing was not an abuse of discretion, and the circuit court's findings regarding parental unfitness and best interests were not contrary to the manifest weight of the evidence. Thus, we affirm the judgment of the circuit court's order terminating Regina's parental rights regarding R.R. and T.R.

¶ 94    Affirmed.

¶ 95    JUSTICE CATES, specially concurring:

¶ 96    I concur with my colleagues that the circuit court's finding that Regina was unfit was not against the manifest weight of the evidence. I also agree that the circuit court's findings regarding the best interests of the children were not against the manifest weight of the evidence. Finally, because of the passage of time, the need for permanency, and the other factors considered by the circuit court, I agree that the circuit court did not abuse its discretion by denying a continuance of the best interests hearing.

¶ 97    I write separately to shine a spotlight on the complete and absolute abdication of the duty of the Department of Children and Family Services (DCFS) to protect Regina—just a teenager herself—and her two children from an environment injurious to their welfare. The failure by DCFS to make reasonable efforts to fulfill its duties to this family, including removal of Regina from the home of her mother, Emma H., until appropriate services could be offered to stabilize the home environment, set the stage for Regina's failure to abide by the terms of her service plan and show reasonable progress toward the return of her children. The cumulative failures by DCFS in this case rose to the level of neglect and, in my view, formed the linchpin for the termination of Regina's parental rights.

¶ 98　As noted by my colleagues, Emma H. and her children had an extensive history with DCFS and other, out-of-state child protective services. The "Shelter Care Report," dated September 25, 2020, revealed that DCFS knew that as early as 2003, Emma H. was "indicated" while living in Tennessee for physical abuse in the home. In 2012, Emma H. was "indicated" by Iowa authorities for failure to provide supervision for her children and for "ALL 4 CHILDREN, including Regina [R.], being positive for cocaine. The children were placed in foster care" for a few months. According to this report, five months later, in October 2012, Emma H. was "indicated", again in Iowa, for physically abusing two of her children. Emma H. had whipped one child with a fan cord, leaving marks. Another child had scars on her back and upper legs as a result of being hit by Emma H. The report does not indicate that the children were removed from the home. Regina would have been seven years old at that time. Subsequently, Emma H. and her children moved to Illinois and DCFS began its involvement with the family. In 2017 and 2018 there were four unfounded reports involving Emma H. and the alleged lack of supervision of her children.

¶ 99　On April 3, 2018, DCFS "indicated" a report against Emma H. involving Regina and one of her siblings. The allegation involved the "Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Neglect." Emma H. was drug screened and was positive for meth and cocaine. "It was also reported that she [Emma H.] was allowing [her daughters'] boyfriends to stay at the house and do drugs." Regina had just turned 13 on March 13, 2018, and would have become pregnant with R.R. around this time. DCFS did not remove Regina or her siblings from the home environment—a missed opportunity.

¶ 100　DCFS was contacted again on June 13, 2018, June 14, 2018, July 24, 2018, and September 4, 2018, regarding the living environment of this family unit. The reports of physical abuse and neglect against Emma H. were all unfounded.

38

¶ 101   Then, on November 12, 2018, Emma H. was "indicated" for "Sexual Penetration" in regard to Regina and her sibling. According to the DCFS report, "Emma was allowing the girls['] boyfriends to live in the home and have sex with their boyfriends. 13-year-old Regina became pregnant as a result of this." DCFS did not remove Regina or her sibling from the home. Regina was now 13 and pregnant with her first child. This time the failure by DCFS to remove Regina from the home of Emma H. was not just a missed opportunity. It was, instead, a failure by DCFS to make reasonable efforts to fulfill its duties to provide protective services and resources to a pregnant teen living in a neglectful environment. Regina could have been taken into protective custody where she would have been provided with stable housing, proper prenatal care, and any other services required for her benefit.

¶ 102   On August 12, 2019, DCFS "indicated" a second report against Emma H. for "Sexual Penetration" regarding Regina and one of her siblings. It was noted that Regina, then 14 years old, was pregnant with a second child. Emma H. was also "indicated" for "Substantial Risk of Physical Injury/Environment Injurious and Inadequate Supervision." Despite being pregnant with her second child within the space of 12 months, Regina was not removed from the home of Emma H. Again, DCFS provided no services that would have allowed Regina to create a safe and stable home for her children and to provide for them financially. As noted above, if Regina had been taken into protective custody with her first child, R.R., she would have received a multitude of services as a pregnant mother. Instead, she was left with Emma H., who had already proven her inability to protect Regina. In fact, according to DCFS, Emma H. approved of the sexual activity between her girls and their boyfriends. Again, DCFS failed to make reasonable efforts to fulfill its duties to protect and provide services to a teen who was pregnant with her second child.

39

¶ 103   But this was not the last opportunity for DCFS to step in and provide protection for Regina. The record demonstrates that DCFS had four additional calls to intercede in 2020. On April 20, 2020, five months before the petition in this case was filed, Emma H. was "indicated" for allowing domestic violence to occur in her home. It turns out that Regina was also "indicated" for domestic violence because she and one of her siblings had a dispute that rose to the level of "Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Neglect due to domestic violence in the home" between Regina and an older sibling. Despite this ominous warning of an environment dangerous to Regina and her two children, DCFS did not remove her from the home of Emma H.

¶ 104   On May 15, 2020, there was a raid at the home of Emma H. Heroin was seized from the home and Emma H. was again indicated for "Environmental Neglect" and "Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Neglect" to Regina and her siblings. Regina was indicated for "Environmental Neglect" to her two children R.R. and T.R. for the same reason as Emma H. DCFS did not remove the infants, nor did they remove Regina from this environment.

¶ 105   On September 14, 2020, just days before Regina was charged with the battery of her sibling, Emma H. was again reported to DCFS.  The case was "pending," but alleged drug use by Emma H.

¶ 106   Finally, on September 23, 2020, Regina was taken into custody and held in the juvenile detention center for the domestic abuse she perpetrated on her sister and Emma H. At that time, DCFS determined that R.R. and T.R. should be taken into protective custody. On September 25, 2020, the State filed its petitions against Regina claiming that R.R. and T.R. were neglected. Regina was 15 years old.

40

¶ 107   By this time, DCFS had already missed multiple opportunities to protect Regina from a home filled with domestic abuse. DCFS's failure to provide services to Regina or make reasonable efforts to fulfill its duties to protect and provide services would have repercussions for the next generation.

¶ 108   In its integrated assessment, dated January 8, 2021, DCFS evaluated Regina and her family environment. The prognosis at that time recognized that Regina's chances of reunification with her children was "guarded." Regina had her first child at age 13, and a second child 10 months later. She had no drivers' license and was living with her mother in a "chaotic environment." The assessment further acknowledged that Regina had been "the victim of abuse" on numerous occasions.

¶ 109   Despite her age, DCFS treated Regina as though she was an adult, capable of carrying out tasks that were impossible for her to complete, especially without resources. For example, DCFS mandated that Regina find suitable housing for herself and her minor children. However, even after a multi-agency staffing meeting held June 28, 2021, DCFS could not find an alternative home environment that DCFS considered safe. Despite its assessment that Emma H. was impeding Regina's progress and that Emma H.'s home was not suitable for Regina or Regina's children, DCFS permitted Regina to reside there. Based upon this record, DCFS was complicit in Regina's failure to find suitable housing. Furthermore, Regina had no means of transportation, although at one point in time DCFS graciously provided Regina with a bicycle.

¶ 110   The failures by DCFS to provide meaningful services continued into January 2022, when the permanency report indicated that Regina continued to live with Emma H. At that time, DCFS still deemed the home unsuitable due to the threats that Emma H. had made toward DCFS. And DCFS still had not filed a service plan with the circuit court, even though Regina was taken into

41

custody on September 23, 2020. Despite the lack of a service plan being on file, DCFS claimed that Regina was aware of the requirements contained in the service plan. The caseworker indicated that Regina continued to rely on Emma H. to contact DCFS and determine what was in the plan.

¶ 111    On January 26, 2022, DCFS finally found the opportunity to file its family service plan with the circuit court. The plan was dated September 21, 2021. A few facts are notable, and bear repeating. In accordance with the service plan, Regina, then 16 years old, was required to find suitable, substance-free housing, obtain mental health services, continue with an education program, get a job providing an adequate income for herself and her children, and engage in all of the required classes, including parenting classes. This was a daunting task for which Regina received no additional assistance from DCFS. The table was set for Regina to fail. And fail she did. It is not necessary to repeat all of the obstacles Regina faced while trying to comply with her service plan. As indicated by my colleagues, DCFS took the position that because it had no legal relationship with Regina, it was not able to assist her in locating suitable housing without the consent of Emma H. This is, of course, because Regina was a minor. As a minor, she could not sign a lease for an apartment or other space. At age 16, Regina was left to rely on her mother, Emma H., to provide for her housing, even though Emma H. was so threatening to DCFS that the caseworker would not visit Regina in her home environment. It is not surprising, then, that DCFS indicated to the circuit court that Regina had not made progress toward the return of her children because she had not found suitable housing. These circumstances were not just ironic. They were a tragedy created by DCFS.

¶ 112    The January 2022, family service plan added Emma H. to the overall plan because Regina was dependent upon Emma H. for "food and shelter." So, then DCFS required an uncooperative

Emma H. to complete a mental health assessment, a substance abuse assessment and participate in random drug screens.

¶ 113 In May 2022, when Emma H. finally allowed DCFS to make random visits to the home where Regina was residing, the caseworkers found the home to be unsuitable for a safe living environment as there were dog feces and urine on the carpets; there were no beds for the minor children; and there was food on the counter and dirty dishes in the sink. The home was cluttered and dirty. DCFS did nothing to find suitable housing for Regina.

¶ 114 Despite the failures by DCFS to fulfill its obligations to Regina, she regularly visited with her children, when allowed. By all accounts, Regina was affectionate and loving toward them. At a status hearing on June 17, 2022, the circuit court agreed that Regina had completed many of the tasks that had been required of her, but that housing remained a barrier toward reunification with her children. Ironically, during the fitness hearing on November 23, 2022, the DCFS caseworker criticized Regina for her failure to obtain suitable housing and income to support herself and the children. The caseworker conceded in her testimony that if Regina had been taken into protective custody earlier in the process, Regina would have been eligible for safe housing where she and her children could have all resided together. This admission by the DCFS caseworker proves the point. DCFS failed Regina, and so she failed her two toddlers. As in a classic Greek tragedy, where humans could not avoid the calamities destined by the gods, Regina was at the mercy of DCFS. She was defined by the DCFS requirements, many of which could not be attained due to her young age. Had DCFS been judged by its own standards, it would have been found to have failed to make reasonable efforts toward fulfilling its duties to protect and provide services for Regina and her children.

43

¶ 115   The DCFS website claims that its goal is "to keep children safe by strengthening and supporting families." See https://dcfs.illinois.gov (last visited Sept. 27, 2023). This goal aptly defines the duty that the Department of Children and Family Services owed to Regina and her two children. In this case, however, DCFS failed, and by abdicating its duty, Regina lost her two children.